**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSHUA PAKDELJAM, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | **Case No.** ) ) ) |
| v. | **CLASS ACTION COMPLAINT** ) ) |
| INTRA-CELLULAR THERAPIES, INC., SHARON MATES, LAWRENCE J. HINELINE and KIMBERLY E. VANOVER, | **JURY TRIAL DEMANDED** ) ) ) ) ) |
| Defendants. | ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Joshua Pakdeljam ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to itself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Intra-Cellular Therapies, Inc. ("Intra-Cellular" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Intra-Cellular securities between August 12, 2014 and April 28, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Intra-Cellular Therapies, Inc. is a biopharmaceutical company that is focused on the discovery and clinical development of innovative, small molecule drugs that address underserved medical needs in neuropsychiatric and neurological disorders by targeting intracellular signaling mechanisms within the central nervous system, or CNS. The Company's lead drug candidate, ITI-007 also known as lumateperone, is supposed to treat schizophrenia, behavioral disturbances in dementia, bipolar disorder and other neuropsychiatric and neurological disorders.

3.      Founded in 2012, Intra-Cellular is headquartered in New York, New York. Intra-Cellular's stock trades on NASDAQ under the ticker symbol "ITCI."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the findings related to toxicity observed in animals treated with lumateperone (ITI-007); (ii) these findings posed an additional safety concern regarding lumateperone; (iii) as a result of the foregoing, Intra-Cellular's public statements were materially false and misleading at all relevant times.

5.    On May 1, 2017, before the market opened, the Company issued a press release entitled, "Intra-Cellular Therapies Provides Corporate Update On Schizophrenia Program" which revealed findings of toxicity in animals treated with lumateperone, stating in relevant part:

As part of our ongoing dialogue with the U.S. Food and Drug Administration (FDA) regarding our lumateperone (also known as ITI-007) development program in schizophrenia, we requested guidance from the FDA on the acceptability of the two positive well controlled clinical trials we have conducted (Study ITI-007-005 and Study ITI-007-301), with supportive evidence from Study ITI-007-302, as the basis for the submission of a new drug application (NDA) for the treatment of schizophrenia. In connection with this request we provided extensive information and data analyses to the FDA relating to the three studies. The FDA has confirmed that the results of Study ITI-007-302 do not preclude us from submitting an NDA based on the efficacy studies we have conducted to date. We are pleased with this response from the FDA and we believe our schizophrenia clinical development program collectively provides evidence of the efficacy and safety of lumateperone for the treatment of schizophrenia.

***The FDA has raised questions, however, relating to certain findings observed in nonclinical animal toxicology studies of lumateperone and has requested additional information to confirm that the nonclinical findings are not indicative of a safety risk associated with long term exposure in humans.*** These findings only occurred in one of the nonclinical toxicology species and only after high exposure to drug related material. We and our expert consultants believe these findings are not indicative of a safety risk for humans due to species differences in the metabolism of lumateperone. In humans, lumateperone and its metabolites are rapidly eliminated from the body and there is no retention of drug or drug related material. In the animal species in question, a substantial amount of drug related metabolites are retained for an extended period of time and metabolites are formed in this species that are not detected in humans.

As we have previously disclosed, in our clinical trials of lumateperone in schizophrenia up to and including 6 weeks treatment duration in humans, lumateperone has a favorable safety and tolerability profile with the incidence of movement disorders and cardiometabolic adverse events similar to placebo and statistically significantly better on several key safety and tolerability parameters than risperidone, the most frequently prescribed antipsychotic for the treatment of schizophrenia. The FDA has not raised any safety concerns regarding the study of lumateperone in short term treatment trials in humans, including our completed schizophrenia clinical trials and our ongoing Phase 3 clinical trials in bipolar depression and agitation associated with dementia, including Alzheimer's disease. With over 1500 people exposed to date, lumateperone has been well-tolerated with a safety profile similar to placebo.

> ***We are preparing responses to the FDA's request for additional information and intend to proceed with our long-term safety study of lumateperone in patients with schizophrenia.*** If the FDA deems our responses regarding the nonclinical findings to be sufficient, we intend to submit an NDA for lumateperone for the treatment of schizophrenia by mid-year 2018 supported by the efficacy studies we have conducted to date. ***If the FDA deems our responses insufficient, they may place our long-term safety study on a clinical hold. The results of the long-term safety study will be required to support an NDA approval for a chronic condition such as schizophrenia.***

(Emphasis added.)

6.     On this news, Intra-Cellular's share price fell $3.33, or over 24%, to close at $10.49 on May 1, 2017.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and §27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as Defendants conduct business and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Intra-Cellular securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Intra-Cellular is incorporated in Delaware. The Company's principal executive offices are located at 430 East 29th Street, New York, New York 10016. Intra-Cellular's shares trade on NASDAQ under the ticker symbol "ITCI."

14.     Defendant Sharon Mates ("Mates") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and President.

15.     Defendant Lawrence J. Hineline ("Hineline") has served at all relevant times as the Company's Chief Financial Officer ("CFO"), Vice President of Finance, Treasurer and Assistant Secretary.

16.     Defendant Kimberly E. Vanover ("Vanover") has served at all relevant times as the Company's Senior Vice President of Clinical Development.

17.     The Defendants referenced above in ¶¶ 14-16 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Intra-Cellular Therapies, Inc. is a biopharmaceutical company that is focused on the discovery and clinical development of innovative, small molecule drugs that address underserved medical needs in neuropsychiatric and neurological disorders by targeting

intracellular signaling mechanisms within the central nervous system, or CNS. The Company's lead drug candidate, ITI-007 also known as lumateperone, is supposed to treat schizophrenia, behavioral disturbances in dementia, bipolar disorder and other neuropsychiatric and neurological disorders.

### Materially False and Misleading Statements Issued During the Class Period

19.    The Class Period begins on August 12, 2014, when Intra-Cellular issued a press release entitled "Intra-Cellular Therapies Reports Financial Results for Second Quarter Ended June 30, 2014," which discussed the safety of the ITI-007-005 Phase 2 study, stating in relevant part:

> *In December 2013, the Company announced positive topline results from the Company's randomized, placebo- and active-controlled Phase 2 clinical trial of ITI- 007 in patients with acutely exacerbated schizophrenia. This study showed a statistically significant improvement in symptoms associated with schizophrenia at the 60 mg dose on the trial's pre-specified primary endpoint and a favorable safety profile.* The Company presented additional data from the Phase 2 trial in April 2014 in a poster and a live presentation at the 4th Biennial Schizophrenia International Research Society (SIRS) held in Florence, Italy, as summarized below, and in May 2014 at the 167th Annual Meeting of the American Psychiatric Association (APA) held in New York City.

(Emphasis added.)

20.    On November 25, 2014, Intra-Cellular issued a press release entitled, "Intra-Cellular Therapies Announces Enrollment of First Patient in Phase 3 Trial of ITI-007 for the Treatment of Schizophrenia" which discussed the beginning of the Phase 3 trial of ITI-007-301 study, stating in relevant part:

> NEW YORK, Nov. 25, 2014 (GLOBE NEWSWIRE) -- Intra-Cellular Therapies, Inc. (Nasdaq: ITCI), a biopharmaceutical company focused on the development of therapeutics for central nervous system (CNS) disorders, announced today that the first patient has been enrolled in the ITI-007-301 Phase 3 trial, a randomized, double-blind, placebo-controlled trial designed to demonstrate the efficacy of ITI-007 for the treatment of schizophrenia. The Company anticipates top-line results from this trial could be available as early as the fourth quarter of 2015. The Company expects to initiate a second ITI-007 Phase 3 trial in schizophrenia,

6

designated as the ITI-007-302 trial, in the first half of 2015. ***In December 2013, the Company announced positive results from a Phase 2 trial in which ITI-007 exhibited antipsychotic efficacy with a favorable safety profile in patients with schizophrenia.***

"ITI-007 is a first-in-class antipsychotic investigational new drug with a novel mechanism of action," said Dr. Sharon Mates, Chief Executive Officer and Chairman. ***"Starting the enrollment of patients in our first Phase 3 trial of ITI-007 for the treatment of schizophrenia marks an important milestone for the Company and for patients who eagerly await safe and effective alternatives to currently available treatment options. We believe ITI-007 has the potential to broadly address multiple symptom domains, including positive symptoms, negative symptoms and depressive symptoms without debilitating motor side effects or metabolic syndrome commonly associated with some antipsychotic drugs."***

(Emphasis added.)

21.     On May 18, 2015, the issued a press release entitled, "Intra-Cellular Therapies Announces Further Analyses of the Phase 2 Clinical Trial of ITI-007 in Schizophrenia at the 168th Annual Meeting of the American Psychiatric Association" which discussed the progress of ITI-007, stating in relevant part:

***Safety and Tolerability:***

ITI-007 demonstrated a favorable tolerability profile with little or no weight gain, a favorable effect on metabolic parameters, and a reduced risk for akathisia and hyperprolactinemia.

- ITI-007 had little or no effect on weight gain analyses including placebo-adjusted mean weight gain by clinical site. In contrast, risperidone resulted in weight gain of approximately 2 kg after adjusting for placebo response.

- In the '005 trial patients received blinded study medication for 28 days and were switched to standard of care (SOC) for a 5-day stabilization period prior to hospital discharge. Insulin, glucose and triglyceride levels remained low during the treatment period for patients randomized to either dose of ITI-007, but increased when patients were switched to SOC. In contrast, glucose, insulin and triglyceride levels were increased during risperidone therapy during the 28-day treatment period.

- Similarly, prolactin levels were low for patients randomized to either dose of ITI-007, but increased after patients were switched to SOC. In contrast,

patients on risperidone experienced a significant increase in prolactin levels during the study period.

- ITI-007 demonstrated a low relative risk of akathisia, with rates of akathisia similar to placebo, in contrast to risperidone which showed a relative risk 3X that of placebo.

Patients treated with conventional or newer second generation antipsychotic drugs (SGAs) for schizophrenia have an increased risk of diabetes and other associated diseases including cardiovascular disease, resulting in a significant burden on our healthcare system. Altered metabolic parameters are known to increase disease risk following certain antipsychotic drug use. Prominent among these metabolic risk factors are elevations in plasma glucose, insulin and triglyceride levels. Existing data suggests that ITI-007 does not impact these metabolic parameters in patients with schizophrenia and may have a substantial potential benefit for this patient population.

***"The additional analyses presented at APA continue to demonstrate ITI-007's unique safety profile.*** We believe the finding that patients' metabolic parameters and prolactin are low while on ITI-007, then worsen after being switched to standard of care antipsychotic therapy, speaks to the beneficial profile of ITI-007," said Dr. Sharon Mates, Chairman and CEO of Intra-Cellular Therapies. "We believe these analyses continue to support the unique potential benefits of ITI-007 for patients, their families, and the healthcare system. Existing data provide evidence for the positioning of ITI-007 as a potential single stand-alone therapy for the treatment of multiple symptoms associated with schizophrenia including positive symptoms and negative symptoms and symptoms of impaired social function."

(Emphasis added.)

22. On September 1, 2015, the Company issued a press release entitled, "Intra-Cellular Therapies Announces Publication of Positive Phase 2 Schizophrenia Study in the Journal Biological Psychiatry" which discussed the results of the Phase 2, ITI-007-005 study, stating in relevant part:

NEW YORK, Sept. 1, 2015 (GLOBE NEWSWIRE) -- Intra-Cellular Therapies, Inc. (NASDAQ:ITCI), a biopharmaceutical company focused on the development of therapeutics for central nervous system (CNS) disorders, today announced the publication of positive results from its ITI-007 Phase 2 clinical trial (ITI-007-005) in patients with schizophrenia. The article, "ITI-007 for the Treatment of Schizophrenia: A 4-Week Randomized, Double-Blind, Controlled Trial" (Lieberman et al. 2015), was published online on September 1st, 2015 in Biological Psychiatry and is available at:

http://www.biologicalpsychiatryjournal.com/article/S0006-3223(15)00694-0/abstract.

In the trial, ITI-007 significantly improved symptoms in patients experiencing an acute exacerbation of schizophrenia at a dose of 60 mg daily, as demonstrated by a statistically significant separation from placebo on the PANSS total score at 4 weeks, the primary endpoint. ***Additionally, ITI-007 was found to be comparable to placebo on measures of safety and tolerability.***

(Emphasis added.)

23.    On December 9, 2015, the Company issued a press release entitled, "Intra-Cellular Therapies Presents Additional Efficacy and Safety Data From the Positive Phase 3 Clinical Trial of ITI-007 for the Treatment of Schizophrenia and From the Positron Emission Tomography Study" which discussed the progress of the ITI-007-301 Phase 3 study, stating in relevant part:

***ITI-007 was well-tolerated and demonstrated a safety profile that did not differ from placebo.*** This study had a high percentage of patients completing treatment, with time to treatment discontinuation (due to any reason) being statistically significantly better with 60 mg ITI-007 than with placebo. The only treatment-emergent adverse events considered at least possibly related to ITI-007, administered orally once daily in the morning, occurring in greater than 5% of patients and at least twice the rate of placebo were somnolence, sedation, and fatigue, all predominantly mild.

ITI-007's motoric, metabolic, and cardiovascular profile was similar to placebo, and there were no clinically significant changes in akathisia, extrapyramidal symptoms, prolactin, body weight, glucose, insulin, and lipids.

Second generation antipsychotic drugs (SGAs) for schizophrenia expose patients to increased risk of diabetes and other associated diseases including cardiovascular disease, resulting in a significant burden on our healthcare system. SGAs also have motoric adverse events impacting patient quality of life, often leading to poor medication adherence. The Company believes existing data suggest that ITI-007 does not impact these metabolic, cardiovascular and motoric parameters in patients with schizophrenia.

***"The Phase 3 trial demonstrated that ITI-007 is efficacious in the treatment of patients with schizophrenia while possessing a favorable safety and tolerability profile particularly in relation to metabolic, motoric and cardiovascular parameters," said Dr. Sharon Mates, Chairman and CEO of Intra-Cellular Therapies. "These data are consistent with prior results seen in our Phase 2***

*study and add further evidence to our belief that ITI-007 may represent an improvement on existing therapies for patients with schizophrenia."*

(Emphasis added.)

24.    On June 30, 2016, Intra-Cellular issued a press release entitled "Intra-Cellular Therapies Reports Completion of Enrollment of ITI-007-302 Phase 3 Clinical Trial for the Treatment of Schizophrenia," announcing the beginning of the Phase 3 ITI-007-302, stating in pertinent part:

NEW YORK, June 30, 2016 (GLOBE NEWSWIRE) -- Intra-Cellular Therapies, Inc. (Nasdaq: ITCI), a biopharmaceutical company focused on the development of therapeutics for central nervous system (CNS) disorders, today announced completion of enrollment in the second Phase 3 clinical trial (ITI-007-302) of the Company's lead product candidate ITI-007 for the treatment of schizophrenia. The Company anticipates topline data will be available later this year.

"The completion of enrollment in our 302 Phase 3 trial is a major milestone in our mission to advance ITI-007 as a new treatment option for patients suffering from mental illness," said Sharon Mates Ph.D., Chairman and CEO of Intra-Cellular Therapies, Inc." We believe ITI-007 has the potential to advance the treatment of schizophrenia by providing efficacy with a reduced side effect burden, thereby allowing patients to stay on treatment and benefit from enhanced social functioning."

**About the ITI-007-302 Phase 3 Trial**

The Phase 3 clinical trial, ITI-007-302, is a randomized, double-blind, placebo- and active-controlled clinical trial in patients with an acutely exacerbated episode of schizophrenia. In this trial, 696 patients were randomized to receive one of four treatments: ITI-007 60 mg, ITI-007 20 mg, risperidone 4 mg (active control) or placebo in a 1:1:1:1 ratio. Patients receive study treatment orally once daily in the morning for 6 weeks. Clinical conduct includes an approximate one-week screening period before randomization followed by the 6-week study treatment period. Prior to discharge from the study, patients are switched to a standard-of-care antipsychotic treatment during a five-day inpatient stabilization period. Patients are instructed to return for an outpatient safety follow-up visit approximately two weeks following the last dose of study treatment (study day 54). The study is being conducted in 13 clinical sites throughout the United States.

The primary endpoint for this clinical trial is change from baseline at Day 42 on the Positive and Negative Syndrome Scale (PANSS) total score. The PANSS is a well-validated 30-item rating scale that measures the ability of a drug to reduce

10

schizophrenia symptom severity (Kay et al., 1987, Schizophrenia Bulletin 13:261-276). The PANSS measures positive symptoms, such as delusions, suspiciousness, and hallucinations; negative symptoms, such as blunted affect, social and emotional withdrawal, and stereotyped thinking; and general psychopathology, such as anxiety, tension, depression, and active social avoidance. The key secondary endpoint is change from baseline at Day 42 on the Clinical Global Impression scale for Severity of Illness (CGI-S) that provides a clinician's expert assessment of the patient's overall symptom severity. Additional secondary endpoints and other measures, including safety and tolerability, which may highlight differentiating clinical features of ITI-007 are also being assessed. ITI- 007 60 mg has demonstrated a statistically significant improvement versus placebo in schizophrenia symptoms and a favorable safety and tolerability profile in two prior late-stage clinical studies.

25.     On August 4, 2016, the Company held a conference call to discuss the second quarter of 2016 earnings (the "2Q16 Conference Call"). On the 2Q16 Conference Call, Defendant Vanover discussed the ITI-007-302 study, stating in relevant part:

> To-date, ITI-007 has demonstrated a statistically significant improvement versus placebo in the control of symptoms associated with schizophrenia. ***ITI-007 has also shown a safety and tolerability profile similar to placebo in two late-stage clinical studies.***
>
> These data as well as unique pharmacological findings from our ITI-007 Positron Emission Tomography or PET studies were highlighted at various scientific and medical conferences during the second quarter, including the Schizophrenia International Research Society meeting or SIRS, the American Psychiatric Association or APA, the Society of Biological Psychiatry or SOBP and the American Society of Clinical Psychopharmacology or ASCP.
>
> Taken together, these data have demonstrated that ITI-007 reduced psychosis in patients with schizophrenia at relatively low levels of striatal D2 receptor occupancy, lower than the occupancy range required by most drugs currently approved for the treatment of schizophrenia. ***This substantiates the unique pharmacology of ITI-007 as well as its ability to provide broad efficacy with a favorable safety and tolerability profile.***
>
> In our first Phase 3 study, or 301, and our Phase 2 study 005 in schizophrenia, ITI-007 60 milligrams demonstrated antipsychotic efficacy as measured by change from baseline in the PANSS total score versus placebo at study endpoint. ITI-007 required no dose titration, showed early onset, and sustained efficacy for the four weeks of treatment.
>
> ***In both trials, ITI-007 was well-tolerated with a safety profile similar to placebo.***

11

(Emphasis added.)

26.    On September 28, 2016, Intra-Cellular issued a press release entitled "Intra-Cellular Therapies Announces Top-Line Results from the Second Phase 3 Trial of ITI-007 in Patients with Schizophrenia (Study '302)," reporting on results of the ITI-007-302 trial, stating in pertinent part:

> NEW YORK, Sept. 28, 2016 (GLOBE NEWSWIRE) -- Intra-Cellular Therapies, Inc. (NASDAQ:ITCI) today announced top-line results from the second Phase 3 clinical trial (Study '302) of ITI-007, an oral, first-in-class investigational medicine for the treatment of schizophrenia. In this trial, neither dose of ITI-007 separated from placebo on the primary endpoint, change from baseline on the Positive and Negative Syndrome Scale (PANSS) total score, in the pre-defined patient population. The active control, risperidone, did separate from placebo. ***In this trial, ITI-007 was statistically significantly better than risperidone on key safety and tolerability parameters and exhibited a safety profile similar to placebo. This replicates the safety and tolerability findings of a previous study (our Phase 2 Study '005) in which the efficacy of ITI-007 60 mg and risperidone, the active control, were similar.*** We believe ITI-007 did not separate from placebo on the pre-specified primary endpoint in Study '302 in part due to an unusually high placebo response at certain sites which disproportionately affected the trial results and contributed to the efficacy outcome of this study compared to our two previous positive efficacy studies. Drug development in psychiatry faces numerous challenges and approved antipsychotics have had negative results as part of their clinical development programs. We are committed and adequately resourced to continue the development of ITI-007 for the treatment of schizophrenia. ***We believe the ITI-007 late-stage clinical development program, including two large, well-controlled positive studies and supportive evidence from this Study '302, collectively provide evidence of the efficacy and safety of ITI-007 for the treatment of schizophrenia.*** Across all three of our efficacy trials, ITI-007 60 mg improved symptoms of schizophrenia with the same magnitude of change from baseline in the primary endpoint, the PANSS total score. We plan to request a meeting with the U.S. Food and Drug Administration's (FDA) Division of Psychiatry Products to discuss the regulatory path for this first-in-class investigational agent.

> "It is not uncommon in the field of psychiatry for studies to be challenged by high placebo response and there has been great variability in the effects observed from one study to the next," said Christoph Correll, M.D., Professor of Psychiatry at Hofstra Northwell School of Medicine. ***"Taken together, the ITI-007 schizophrenia program supports ITI-007 as a unique medication with an unprecedented safety and tolerability profile. Moreover, efficacy has been demonstrated in two large-scale schizophrenia studies to date. In one of these studies, ITI-007 and risperidone, the active control, had similar efficacy. In***

*light of the results to date, I believe that ITI-007 represents a unique investigational medication which has the potential to advance the treatment of patients suffering from schizophrenia."*

*In this study, consistent with our previous schizophrenia studies, ITI-007 was well-tolerated with a safety profile similar to placebo. There were no clinically significant differences with ITI-007 from placebo in akathisia, extrapyramidal symptoms, prolactin, body weight, glucose, insulin, and lipids.* As expected, risperidone demonstrated a statistically significant increase in weight gain, glucose, cholesterol, triglycerides and prolactin compared to placebo. These increases have a negative impact on patients. In contrast, ITI-007 was statistically significantly better than risperidone on all of these tolerability parameters. There were no significant increases observed with ITI-007 versus placebo on any of these parameters. There continues to be a need for safer and more tolerable medications for patients with schizophrenia, which are not associated with the motoric and cardio-metabolic side effects of many existing treatments, thereby potentially improving compliance and reducing relapse and hospitalizations. We believe ITI-007 has the potential to address this need.

*"Based on the strength of the clinical data generated in this program to date, including two positive studies, supportive evidence from Study '302 and a consistent, well-tolerated and placebo-like safety profile across all studies, we continue to believe ITI-007 will be an important treatment for patients suffering from schizophrenia. We remain committed to the development of ITI-007 for the treatment of schizophrenia, bipolar depression, agitation associated with dementia, including Alzheimer's disease and other neuropsychiatric indications," said Dr. Sharon Mates, Chairman and CEO of ITCI.*

(Emphasis added.)

27.    On November 9, 2016, the Company held a conference call to discuss the third quarter of 2016 earnings (the "3Q16 Conference Call"). On the 3Q16 Conference Call Defendant Mates discussed the safety of ITI-007, stating in relevant part:

In two studies, the efficacy of ITI-007 60 milligrams was demonstrated showing a statistically significant separation from placebo on the primary endpoint Positive and Negative Syndrome Scale or PANSS total score. *Across all three studies, ITI-007 was found to be well tolerated with a placebo-like safety profile.*

This is so important for patients who currently suffer from side-effects that lead them to discontinue their medication. Importantly, in two studies where risperidone was used as an active control, *ITI-007 was statistically significantly superior to risperidone on several key safety and tolerability parameters such as triglyceride, cholesterol, glucose, prolactin and weight gain.*

13

***

*We believe the totality of the data from all studies in our ITI-007 late-stage clinical development program supports the efficacy and safety of ITI-007 for the treatment of schizophrenia representing an advancement for patients.* We have requested a meeting with the FDA to discuss the submission of our NDA for the treatment of schizophrenia. We expect to providing update on the status of our discussions with the FDA in the first quarter of 2017.

***

*[W]e do believe that our package to the FDA is robust and that our studies to-date supports the efficacy and the safety of ITI-007 for the treatment of schizophrenia.*

***

I think that first of all, we – as you know, *we do believe that our data is robust and that the three studies that we have done supports the efficacy and the safety of ITI-007 for the treatment of schizophrenia.*

(Emphasis added.)

28.    On March 1, 2017, the Company held a conference call to discuss the fourth quarter of 2016 earnings (the "4Q16 Conference Call"). On the 4Q16 Conference Call, Defendant Mates discussed the safety of ITI-007-302, stating in relevant part:

Additionally, across all three studies, *Lumateperone was found to be well tolerated with a safety profile similar to placebo* and was devoid of the clinical irrelevant adverse event including movement disorders and metabolic disturbances commonly observed with other anti-psychotic and which can often lead to non-adherence treatment, discontinuation and relapse.

Importantly in the two studies where risperidone was included as an act of control Lumateperone demonstrated a highly differentiated safety and tolerability profile versus risperidone, the most frequently prescribed anti-psychotic for the treatment of Schizophrenia.

*In our studies Lumateperone was statistically significantly superior to risperidone on several key safety and tolerability parameters* such as triglycerides, cholesterol, glucose, prolactin and weight gain.

We have been excited and encouraged by the response from the scientific and medical community when we have presented these data at medical conference. New research published recently in JAMA Psychiatry by [Indiscernible] discusses the inherent risk which patients with Schizophrenia have for developing Type-2

14

diabetes again emphasizing the need for improved treatment options that avoid the cardio metabolic issues associated with other drugs.

We believe Lumateperone can address this unmet need. We have a meeting scheduled with the FDA in late March to discuss the submission of our NDA for Lumateperone for the treatment of Schizophrenia. We expect to provide an update on the status of our discussions following this meeting.

We also had a positive pre NDA meeting with the FDA regarding the chemistry manufacturing and controls, CMC data package. Additionally, we have signed a long term agreement with a third party manufacturer for the supply of Lumateperone in commercial quantities. *We believe that the Lumateperone late stage clinical development program which includes two positive large, well-controlled studies and supportive data from a third study collectively provide evidence for the efficacy and safety of Lumateperone for the treatment of Schizophrenia.*

(Emphasis added.)

29.    On the 4Q16 Conference Call, Defendants Mates and Vanover had the following exchange with an analysis:

**Robert Hazlett**

So, can you comment on the risk benefit side, did you comment on that at all?

**Sharon Mates**

*Well, we have an unprecedented safety profile we believe in human's one or two.*

**Kimberly Vanover**

*Right. Sol, we believe we have two positive studies of Lumateperone for the treatment of schizophrenia and Lumateperone has shown to be well tolerated with the safety profile similar to placebo and has shown advantages in the clinical trial over the risperidone which we've previously discussed for our clinical program.*

(Emphasis added.)

30.    The statements referenced in ¶¶ 19-29 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.

Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the findings related to toxicity observed in animals treated with lumateperone (ITI-007); (ii) these findings posed an additional safety concern regarding lumateperone; (iii) as a result of the foregoing, Intra-Cellular's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

31.    On May 1, 2017, before the market opened, the Company issued a press release entitled, "Intra-Cellular Therapies Provides Corporate Update On Schizophrenia Program" which revealed findings of toxicity in animals treated with lumateperone, stating in relevant part:

> As part of our ongoing dialogue with the U.S. Food and Drug Administration (FDA) regarding our lumateperone (also known as ITI-007) development program in schizophrenia, we requested guidance from the FDA on the acceptability of the two positive well controlled clinical trials we have conducted (Study ITI-007-005 and Study ITI-007-301), with supportive evidence from Study ITI-007-302, as the basis for the submission of a new drug application (NDA) for the treatment of schizophrenia. In connection with this request we provided extensive information and data analyses to the FDA relating to the three studies. The FDA has confirmed that the results of Study ITI-007-302 do not preclude us from submitting an NDA based on the efficacy studies we have conducted to date. We are pleased with this response from the FDA and we believe our schizophrenia clinical development program collectively provides evidence of the efficacy and safety of lumateperone for the treatment of schizophrenia.
>
> ***The FDA has raised questions, however, relating to certain findings observed in nonclinical animal toxicology studies of lumateperone and has requested additional information to confirm that the nonclinical findings are not indicative of a safety risk associated with long term exposure in humans.*** These findings only occurred in one of the nonclinical toxicology species and only after high exposure to drug related material. We and our expert consultants believe these findings are not indicative of a safety risk for humans due to species differences in the metabolism of lumateperone. In humans, lumateperone and its metabolites are rapidly eliminated from the body and there is no retention of drug or drug related material. In the animal species in question, a substantial amount of drug related metabolites are retained for an extended period of time and metabolites are formed in this species that are not detected in humans.
>
> As we have previously disclosed, in our clinical trials of lumateperone in schizophrenia up to and including 6 weeks treatment duration in humans,

16

lumateperone has a favorable safety and tolerability profile with the incidence of movement disorders and cardiometabolic adverse events similar to placebo and statistically significantly better on several key safety and tolerability parameters than risperidone, the most frequently prescribed antipsychotic for the treatment of schizophrenia. The FDA has not raised any safety concerns regarding the study of lumateperone in short term treatment trials in humans, including our completed schizophrenia clinical trials and our ongoing Phase 3 clinical trials in bipolar depression and agitation associated with dementia, including Alzheimer's disease. With over 1500 people exposed to date, lumateperone has been well-tolerated with a safety profile similar to placebo.

***We are preparing responses to the FDA's request for additional information and intend to proceed with our long-term safety study of lumateperone in patients with schizophrenia.*** If the FDA deems our responses regarding the nonclinical findings to be sufficient, we intend to submit an NDA for lumateperone for the treatment of schizophrenia by mid-year 2018 supported by the efficacy studies we have conducted to date. ***If the FDA deems our responses insufficient, they may place our long term safety study on a clinical hold. The results of the long-term safety study will be required to support an NDA approval for a chronic condition such as schizophrenia.***

(Emphasis added.)

32.    On this news, Intra-Cellular's share price fell $3.33, or over 24%, to close at $10.49 on May 1, 2017.

33.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

34.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Intra-Cellular securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of

17

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

35.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Intra-Cellular securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Intra-Cellular or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Intra-Cellular;

- whether the Individual Defendants caused Intra-Cellular to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Intra-Cellular securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

40.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Intra-Cellular securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Intra-Cellular securities between the time the Defendants failed to disclose or

misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

41.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

42.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

43.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

45.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and

20

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Intra-Cellular securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Intra-Cellular securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

46.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Intra-Cellular securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Intra-Cellular's finances and business prospects.

47.    By virtue of their positions at Intra-Cellular, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

48.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of Intra-Cellular, the Individual Defendants had knowledge of the details of Intra-Cellular's internal affairs.

49.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Intra-Cellular.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Intra-Cellular's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Intra-Cellular securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Intra-Cellular's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Intra-Cellular securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

50.    During the Class Period, Intra-Cellular securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Intra-Cellular securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff

22

and the Class, the true value of Intra-Cellular securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Intra-Cellular securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

51.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

52.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

53.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54.    During the Class Period, the Individual Defendants participated in the operation and management of Intra-Cellular, and conducted and participated, directly and indirectly, in the conduct of Intra-Cellular's business affairs.  Because of their senior positions, they knew the adverse non-public information about Intra-Cellular's misstatement of income and expenses and false financial statements.

55.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Intra-

Cellular's financial condition and results of operations, and to correct promptly any public statements issued by Intra-Cellular which had become materially false or misleading.

56.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Intra-Cellular disseminated in the marketplace during the Class Period concerning Intra-Cellular's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Intra-Cellular to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Intra-Cellular within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Intra-Cellular securities.

57.     Each of the Individual Defendants, therefore, acted as a controlling person of Intra-Cellular.  By reason of their senior management positions and/or being directors of Intra-Cellular, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Intra-Cellular to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Intra-Cellular and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

58.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Intra-Cellular.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 26, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
         ahood@pomlaw.com
         hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*